J-A22029-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| BRANDON JUNE WILSON | |
| Appellant | No. 3217 EDA 2016 |

Appeal from the Judgment of Sentence September 6, 2016
In the Court of Common Pleas of Monroe County
Criminal Division at No(s): CP-45-CR-0000597-2014

BEFORE:  BOWES, J., LAZARUS, J., and PLATT, J.[*]

MEMORANDUM BY LAZARUS, J.:              **FILED JANUARY 19, 2018**

Brandon June Wilson appeals from his judgment of sentence, entered in the Court of Common Pleas of Monroe County, following his conviction for third-degree murder (F-1),[1] conspiracy (F-1)[2] and three counts of recklessly endangering another person (REAP) (M-2).[3]  After careful review, we reverse and remand for a new trial.

The trial court summarized the facts underlying this appeal as follows:

On January 13, 2014, Kaylynn Bunnell and her boyfriend, Matt Flores, sought to buy drugs from Brandon Kravchenko. A deal

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. § 2502(c).

[2] 18 Pa.C.S. § 903.

[3] 18 Pa.C.S. § 2705.

was set up and Kravchenko put Flores in contact with a man named "Jordan" in the parking lot of the Big Star to buy Percocet 30s. During this deal, "Jordan" took Flores and Bunnell's money and gave them fake drugs in return. Bunnell then called her best friend, Jacqueline Harrigan, to complain about the bad drug deal. Bruce Murray, Harrigan's boyfriend, answered the phone and listened to Bunnell's complaints. Murray then asked if Bunnell wanted to do anything about the drug deal and Bunnell said she did.

Murray, a member of the Black P-Stone street gang, contacted Sirvonn Taylor,[4] an "amnir" in the gang, for direction on how to handle the situation. Taylor gave the go-ahead for a confrontation, instructing Murray to take Dyqunn Mitchell, another Black P-Stone, with him, Murray, Harrigan, and Bunnell drove to pick up Mitchell. [Wilson], also a Black P-Stone, was with Mitchell and overheard the conversation. [Wilson] was subsequently asked if he also wanted to go. [Wilson] agreed and a loaded gun was placed in the trunk of the car.

Upon arrival at the Kra[]vchenko residence, Bunnell and Harrigan knocked on the door and spoke to a man inside. The man was later identified as "Jordan," the man who sold Bunnell the fake drugs. At that point, Murray called Taylor again. As a result of the conversation with Taylor, the men retrieved the gun from the trunk and the entire group got back in the car. [Wilson] instructed Bunnell to "creep" by the house and while she did that, [Wilson] and Mitchell shot at the Kravchenko residence. One of the bullets entered the bedroom window and hit Darcy Kravchenko in the head, causing his death shortly thereafter.

The above evidence was presented to a jury, which convicted [Wilson] of Murder in the Third Degree, Conspiracy, and three counts of Recklessly Endangering Another Person. After a pre-sentence investigation, we sentenced [Wilson] as follows: for the conviction of Murder in the Third Degree, a period of incarceration of not less than 16 years, nor more than 40 years; for the conviction of Conspiracy, a period of incarceration of not less than 16 years, nor more than 40 years to run concurrent

---

[4] The trial court granted the Commonwealth's motion to join Wilson's case with that of co-defendant Taylor.

with the sentence imposed to Murder in the Third Degree; and for the convictions of Recklessly Endangering Another, a period of incarceration for each Count of not less than 7 months, nor more than 18 months, with each sentence running consecutive to the other sentences. [Wilson]'s aggregate sentence is a period of incarceration of not less than 213 months, nor more than 534 months. [Wilson] was entitled to a time credit of 380 days.

On September 16, 2016, [Wilson] filed a [m]otion for [m]odification of [s]entence, alleging his sentence was excessive in light of several mitigating factors. [The trial court] denied this motion by [o]rder on September 20, 2016.

Trial Court Opinion, 11/14/16, at 1-3.

Wilson filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. He raises the following issues for our consideration:

(1) Did the trial court err in failing to grant [Wilson] a new trial in light of its numerous erroneous evidentiary rulings, including most notably its decision to allow the Commonwealth to use a statement made by [Wilson] during plea negotiations in its case-in-chief?

(2) Did the trial court err in failing to conclude that the verdict was against the sufficiency of the evidence?

(3) Did the trial court err in refusing [Wilson's] requested jury instructions on (a) involuntary manslaughter[;] (b) the voluntariness of his statement under *Miranda*[5;] and (c) the "missing evidence" jury instruction?

(4) Did the trial court abuse its discretion by sentencing Wilson to an aggregate state prison sentence of 17.75 years to 44.5 years in state prison?

Appellant's Brief, at 5.

_____

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

- 3 -

Wilson first contends that the trial court impermissibly permitted the Commonwealth, in its case-in-chief, to use a statement he made during plea negotiations at trial. The statement detailed Wilson's involvement in the homicide and his connection to the Black P-Stone Gang. Wilson contends the court's admission of his statement was a direct violation of Pa.R.E. 410(a)(4) and is reversible error.

Pursuant to Rule 410:

(a) Prohibited Uses. In a civil or criminal case, evidence of the following is not admissible against the defendant who made the plea or participated in the plea discussions:

(1) a guilty plea that was later withdrawn;

(2) a nolo contendere plea;

(3) a statement made in the course of any proceedings under Rules 311, 313, 409, 414, 424, 550 or 590 of the Pennsylvania Rules of Criminal Procedure, Rule 11 of the Federal Rules of Criminal Procedure, or a comparable rule or procedure of another state; or

**(4) a statement made during plea discussions with an attorney for the prosecuting authority if the discussions did not result in a guilty plea or they resulted in a later withdrawn guilty plea.**

(b) Exceptions. The court may admit a statement described in Rule 410(a)(3) or (4):

(1) in any proceeding in which another statement made during the same plea or plea discussions has been introduced, if in fairness the statements ought to be considered together; or

(2) in a criminal proceeding for perjury, false swearing or unsworn falsification to authorities, if the defendant made the statement under oath, on the record, and with counsel present.

Pa.R.E. 410 (emphasis added). The purpose behind Rule 410 is that "if negotiations fail or the plea is withdrawn," admissions arising out of and inherent in the plea discussion are protected from admission into evidence at trial. ***Commonwealth v. Calloway***, 459 A.2d 795, 800 (Pa. Super. 1983).[6]

In ***Commonwealth v. Widmer***, 120 A.3d 1023 (Pa. Super. 2015), our Court concluded that the trial court properly admitted at trial the defendant's statements made during plea negotiations, finding that: the

_____

[6] To the extent that the Commonwealth claims that Wilson waived this issue on appeal for his failure to "then, or at any time thereafter raise the claim that his plea agreement was entered into involuntarily or unknowingly," we disagree. On June 3, 2016, Wilson filed a petition for reconsideration of the denial of his motion *in limine* asserting therein that:

> The rationale for the admission of the proffer in ***Commonwealth v. Widmer*** [] relied upon by the Commonwealth is wholly distinguishable from the instant matter in that Mr. Widmer expressly agreed, on the record at the time of making the proffer, that the Commonwealth would be permitted to use the proffer at trial in the event he reneged upon the plea agreement. **No such agreement was made with Mr. Wilson.**"

Petition for Reconsideration, 6/3/16, at ¶6 (emphasis added). Additionally, at a May 24, 2016 proceeding, defense counsel raised the precise Rule 410 waiver issue, stating "it's our position that the Commonwealth never did carry its burden of proof to prove that there was a knowing and voluntary waiver at the time that the proffer was given." N.T. Proceedings, 5/24/16, at 7.

From the above facts, it is clear that Wilson was alleging that he never expressly or impliedly waived his rights under Rule 410 by agreeing to permit the Commonwealth to use his statement at trial if he chose to proceed to trial. Accordingly, we decline to find waiver. ***See*** Pa.R.A.P. 302(a) (issues not raised in lower court are waived and cannot be raised for first time on appeal).

rights at issue were waivable; the defendant's waiver was knowing and voluntary; *the assistant district attorney unequivocally indicated that the defendant's statements would be used at trial if his plea was not entered*; there was no indication using the defendant's statements would depend upon whether he testified; and, the defendant's chances of acquittal were relatively slim. *Id.*

Wilson distinguishes *Widmer* by arguing that his statement was not unsolicited or voluntary, and that he exhibited a subjective expectation that his statement was for plea purposes only and could not be used at trial. Appellant's Brief, at 18-19. We agree.

In the instant case, on May 21, 2014, Wilson and his attorney met with state police investigators and members of the District Attorney's Office at which time Wilson ultimately gave a statement detailing his involvement in the homicide and his connections to the Black P-Stone Gang in exchange for an open guilty plea to third-degree murder (accomplice), with no agreement as to sentencing. Prior to giving his statement, Assistant District Attorney Michael Mancuso ("ADA") asked Wilson "to give a truthful proffer and otherwise cooperate with the investigators in that case." Statement under Oath ("the Agreement"), 5/21/14, at 4. However, *the ADA told Wilson that "whatever you give will be subject to use and derivative use immunity [and that the Commonwealth] will not be using your statements against you or evidence derived from your statements against you in any court proceeding.*" *Id.* The ADA later qualified this agreement by stating,

"**But [the statement] has to be truthful . . . [o]r everything goes away.**" ***Id.*** (emphasis added).

Several months later, Wilson met with his attorney to prepare his testimony for co-defendant Taylor's omnibus pretrial motion hearing, in conformity with the Agreement. During that meeting, Wilson contradicted a detail he had given in his May 2014 statement.[7] When Wilson later refused to testify at Taylor's omnibus hearing, the Commonwealth filed a motion seeking imposition of sentence claiming that Wilson had breached the Agreement.

Wilson later withdrew his guilty plea to third-degree murder, as an accomplice, and the matter was scheduled for trial. Citing Rule 410, defense counsel filed a motion to preclude the Commonwealth from using his statement, made during plea negotiations, at trial. The trial judge denied the motion, concluding that Wilson had waived the inadmissibility of his statement under Rule 410 by breaching the agreement when he refused to testify against Taylor. At trial, the Commonwealth used Wilson's statement under oath during its opening and closing arguments as well as referencing it during its case-in-chief.

> Although a plea agreement occurs in a criminal context, it remains contractual in nature and is to be analyzed under

---

[7] Specifically, Wilson stated that the co-defendant had never offered to take him to Maine to hide him from authorities after the homicide. ***Cf.*** Statement under Oath of Brandon E. Wilson, 5/21/14, at 43-44.

contract-law standards. Furthermore, disputes over any particular term of a plea agreement must be resolved by objective standards. A determination of exactly what promises constitute the plea bargain must be based upon the totality of the surrounding circumstances and involves a case-by-case adjudication.

*Commonwealth v. Kroh*, 654 A.2d 1168, 1172 (Pa. Super. 1995) (citations omitted). Moreover, we must resolve any dispute in the terms by objective standards and any ambiguities are to be construed against the Commonwealth. *Id.*

The Commonwealth admits that Wilson's statement was made during plea negotiations in the underlying homicide case. *See* Commonwealth's Brief, at 15. *See also Commonwealth v. Miller*, 568 A.2d 228 (Pa. Super. 1990); *Calloway*, *supra*. We must, however, properly characterize the statement to determine whether it is admissible. In *Calloway*, *supra*, our Court set forth a test to determine the appropriate characterization of statements made during plea negotiations:

> [F]irst, whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion, and second, whether the accused's expectation was reasonable given the totality of the objective circumstances. **Of primary importance in assessing an accused's subjective expectation of negotiating a plea is whether the Commonwealth showed an interest in participating in such discussions.** In line with this reasoning, voluntary, unsolicited statements uttered by an accused to authorities cannot be said to be made in furtherance of striking a plea bargain.

*Id.* at 800-801 (emphasis in original).

- 8 -

Instantly, the Commonwealth approached defense counsel and offered Wilson a plea deal in exchange for his proffer. In fact, the Commonwealth admits that Rule 410 is applicable in the instant case. **See** Appellee's Brief, at 21; **see also Burno**, **supra** (where under totality of circumstances defendant exhibited subjective expectation to negotiate plea and expectation was objectively reasonable, confession is type of statement protected under Rule 410). While the trial court concluded that Wilson's statement was admissible because he ultimately failed to uphold his end of the bargain by not testifying at Taylor's pretrial hearing, the court incorrectly determined that Wilson effectuated a knowing and intelligent Rule 410 waiver. In order to overcome the prohibition against admitting statements made during plea negotiations under Rule 410, a defendant must knowingly and voluntarily waive the inadmissibility of his statements as part of the bargain he strikes with the Commonwealth during plea negotiations. **See Widmer**, **supra**.

In concluding that Wilson's statement was admissible, the trial court stated:

> In the conversation with ADA Man[c]u[s]o, [Wilson] stated that he understood that "everything else goes away" if [he] failed to uphold his end of the agreement. Reading this statement in context, "everything" refers to ADA Mancuso's immediately preceding comment regarding use immunity of [Wilson's] statements. **See id.** We find that the exchange between ADA Mancuso and [Wilson] falls within the standard set by the Superior Court for waiver of [Wilson's] rights under Rule 410. [Wilson] was represented by counsel at the proffer. [Wilson] has not put forward any evidence that shows an "affirmative indication that the agreement was entered into unknowingly or involuntarily."

Trial Court Opinion, 5/5/15, at 9. In its analysis, the trial court asserts that Wilson failed to prove that he entered into the agreement unknowingly or involuntarily.[8] Keeping in mind the intent behind Rule 410, namely the sanctity of plea negotiations and the role that bargaining plays in the administration of justice, we disagree with the trial court and conclude that the admission of Wilson's statement was error. **See generally Commonwealth v. Jones**, 544 A.2d 54 (Pa. Super. 1988).

Here, the language used by the ADA, during his May 21, 2014 meeting with Wilson, does not clearly indicate that the Commonwealth predicated its plea bargain with Wilson upon Wilson waiving his rights under Rule 410. Contrary to the trial court's conclusory analysis determining that Wilson affirmatively waived his rights under 410, we find that any such intention is equivocal at best where the ADA never specifically informed Wilson on the record that the Commonwealth would use his statement against him at trial or ever suggested that it could use the statement in its case-in-chief. **Cf. Widmer**, **supra** (defendant waived Rule 410 rights where Commonwealth "clearly indicated [its] intent to use [defendant's] statements regardless of

_____

[8] Interestingly, in its instruction to the jury, the trial judge acknowledged that it was the Commonwealth's burden to prove, by a preponderance of the evidence, that Wilson's statement was made voluntarily. N.T. Jury Trial, 6/15/16, at 129-30. The determination that Wilson made the statement voluntarily, during the plea negotiation process, is a completely different question than whether he also voluntarily agreed to waive his Rule 410 rights as part of the plea bargain.

whether he testified at trial."). In fact, the ADA indicated exactly the opposite when it told Wilson that "[w]e will not be using your statements against you or evidence derived from your statements against you in any court proceeding." N.T. Statement Under Oath, 5/21/14, at 4-5. Finally, by choosing to use the phrase, "[o]r everything goes away," the Commonwealth did not make the waiver of Wilson's Rule 410 rights a clear and explicit condition of his plea agreement. Because we must resolve any ambiguities against the Commonwealth, **Kroh**, **supra**, we find that admission of the statement was in error.

Even if we conclude that Wilson did not waive his Rule 410 rights, we must determine whether the admission of his statement at trial is harmful error. A new trial is not required if the trial court's error is harmless and could not have contributed to the verdict. **Commonwealth v. McCloskey**, 656 A.2d 1366 (Pa. Super. 1995). Where the trial error arises under state law, the proper standard for determining whether an evidentiary error is harmless is a question of state law. **Id.** An error is harmless only if the appellate court is convinced beyond a reasonable doubt that the error is harmless. **Commonwealth v. Story**, 383 A.2d 155 (Pa. 1978).

In **Commonwealth v. Burno**, 154 A.3d 764 (Pa. 2017), our Supreme Court recently addressed the issue of admission of a defendant's inculpatory statements, made during plea negotiations, in violation of Rule 410. Although the Court concluded that the trial court erred in admitting the statements, it nonetheless affirmed the defendant's judgment of sentence

- 11 -

finding that the error was harmless where the tainted evidence was substantially similar to the untainted evidence, the untainted evidence was indisputable, and the plea statement was merely cumulative of incriminating tape recorded statements that defendant had made from the jail which were played to the jury during trial. **Id.** at 787-88.

Here, Wilson claims that the admission of his statement was so prejudicial that it essentially foreclosed his ability to present a meaningful defense. Specifically, he asserts that the proffer "corroborated statements by [his] alleged co-conspirators, establish[ed] his presence at the scene, connect[ed] him with the Black P-Stone gang, and establish[ed] a motive for the crime." Appellant's Brief, at 26.

It is well-settled that the Commonwealth bears the burden of establishing that an error was harmless beyond a reasonable doubt. **See Commonwealth v. Story**, 383 A.2d 155, 162 n.11 (Pa. 1978). This Court has explained:

> This burden is satisfied when the Commonwealth is able to show that: (1) the error did not prejudice the defendant or the prejudice was *di minimis*; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

**Commonwealth v. Levanduski**, 907 A.2d 3, 21 (Pa. Super. 2006) (en banc).

- 12 -

The following requirements must be met before a court may conclude that improperly admitted evidence is merely cumulative of other evidence presented and, therefore, did not affect the jury verdict:

(1) There should be substantial similarity, in type of evidence and incriminating factual details, between the tainted evidence and the untainted evidence of which it is 'cumulative'[;] (2) the untainted evidence should be indisputable, either because the facts are in some way affirmatively accepted by the defendant or for other reasons[; and] (3) care should be taken that the 'untainted' evidence in no way derives from the tainted evidence.

**Bruno**, 154 A.3d at 787 (citing **Story**, **supra** at 165).

After a careful review of the record, we are not convinced, beyond a reasonable doubt, that the error in admitting Wilson's statement was harmless. **Story**, **supra**. Evidence of a reduced verdict (here, third-degree rather than first degree murder)[9] to show an error was harmless has been rejected by our Supreme Court. **See Commonwealth v. Turner**, 454 A.2d 537 (Pa. 1982).

In addition, here Jacqueline Harrigan was the only eyewitness to testify for the Commonwealth. She, herself, was an accomplice to the same crime and, admittedly, an unreliable source. In its brief, the Commonwealth

---

[9] The Commonwealth charged Wilson with and the court charged the jury on first-degree murder, third-degree murder, criminal conspiracy to commit criminal homicide, tampering with evidence, and three counts of REAP. The criminal homicide charges were also charged separately as direct liability and accomplice liability. N.T. Jury Trial, 6/15/16, at 138.

- 13 -

relegates a portion of a footnote[10] to analyze whether it was harmless error to admit Wilson's statement under Rule 410, stating:

> Assuming arguendo that it was error to utilize the statement or any portion thereof the evidence was harmless in light of the Pennsylvania Supreme Court's analysis in **Burno**[,] [**s**]**upra**[,] where the statement was corroborated by the testimony of an eyewitness, i.e., the co-defendant Jacqueline Harrigan who **clearly witnessed** the appellant committing the drive[-]by shooting along with the co-defendant Daygunn Mitchell [or, Buy Buy] and also heard the appellant's statements following the drive by as he instructed the driver on how to leave the scene. Additional corroboration included appellant's texts to his co-defendant Mitchell later in the day. Additionally, the **strong sentimental connection** the appellant felt with the Black P-Stone gang and its leaders Sirvonn Taylor was greatly emphasized in several recorded inmate telephone conversations the appellant had with Taylor in which he wanted "status" for his work on behalf of the gang and continued loyalty to its leader. Further, [Wilson's] flight to avoid apprehension was properly utilized in trial against him as further consciousness of guilt. As a result of the foregoing and in light of the **Burno** analysis, any error was harmless.

Commonwealth's Brief, at 26 n.6 (emphasis added).

We first note that Harrigan's testimony hardly amounted to her "clearly witness[ing Wilson] commit[] the drive by shooting." **Id.** At trial, Harrigan, testifying for the Commonwealth, gave the following testimony regarding the shooting:

> It was in my right ear, and I was turned like this to ash out my window, so it was directly behind me.

---

[10] We note that the trial court never addressed harmless error, finding that Wilson had waived his rights under Rule 410, and, thus, his statement was admissible.

\* \* \*

Because I was ashing out my cigarette, I could see in the side-view mirror Shoota hanging out the window.

\* \* \*

Yeah, he was like leaning, but his full upper body was out of the window.

\* \* \*

The first shot went off in my ear, and then I saw the second shot in the side-view mirror, and I saw it light him up.

\* \* \*

The flare from the gun. I could see his hair, and like I could see that his whole upper body was out of the window, and then by the time the third shot went off I put my head down.

\* \* \*

Shoota tells [the driver] to go, to continue driving, because I think when she got scared she stopped and he starts yelling at her to go, go, go, and she takes off down the road. And then he tells her "Drive slow, I'm not trying to get pulled over."

N.T. Jury Trial, 6/13/16, at 52-54. Not only was Harrigan in the process of putting out her cigarette and facing the front of the car when she heard the first shot ring out, but she never definitely stated that she saw Wilson with the gun in his hand or saw him shoot it. Rather, Harrigan testified that she saw Wilson hanging out of the car and that the fired shot "lit him up."

By contrast, Wilson stated that he told Day Day and the group that if he knew they were going to try to do something "[he] wouldn't [have] even came [sic] . . . [he] would have been with my shorty in my brother['s] crib[,]" that he had never touched the gun and never shot the gun that

- 15 -

day.[11] Statement under Oath of Brandon E. Wilson, 5/21/14, at 33, 44, 71. Then he stated that he tried to dissuade Day Day from using the gun, that he told him "no," and was about to reach for Day Day's arm when the first shot went off. *Id.* Wilson then stated that he grabbed Day Day's hand, Day Day told the driver to slow down, but Day Day continued to shoot, firing three more shots and hitting the window of the room where the victim was sleeping. *Id.* at 34. Finally, Wilson stated that he told the driver of the car, immediately following the shooting, to slow down because he did not want to get in an accident. *Id.*

Under these facts, one can hardly say that Harrigan's testimony was cumulative of Wilson's; it was not substantially similar to Wilson's statement, nor was her testimony indisputable. *Story*, *supra*; *Burno*, *supra*. Moreover, we cannot conclude the admission of Wilson's statement resulted in little to no prejudice or that the admitted and uncontradicted evidence of guilt was so overwhelming. *Levanduski*, *supra*. Accordingly, we do not find, beyond a reasonable doubt, that admission of Wilson's statement could not have contributed to the verdict. *McCloskey*, *supra*.

Here, where Wilson did not waive his Rule 410 rights, the court admitted his statement made during plea negotiations, and where admission

---

[11] Wilson qualified this by stating that he had only touched the gun earlier in the day at Day Day's house. Statement under Oath of Brandon E. Wilson, 5/21/14, at 44.

of the statement was not harmless error, we must reverse and remand for a new trial.

Judgment of sentence reversed.  Case remanded for new trial.[12]

Judge Platt joins the Memorandum.

Judge Bowes files a Concurring Memorandum.


*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*


*Date: 1/19/2018*

---

[12] Having concluded that Wilson is entitled to a new trial, we need not review his remaining claims of trial and sentencing court error.